UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

MOLLIE MINSKOFF,                       :
                                       :
                      Plaintiff,       :    **MEMORANDUM DECISION**
                                       :    **AND ORDER**
        - against -                    :
                                       :    23-cv-584 (BMC)
HECTOR MENDOZA, JR.,                   :
                                       :
                      Defendant.       :

-------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff Mollie Minskoff brings this case against her former boyfriend, defendant Hector

Mendoza Jr., for sexual assault and sexual battery.  Defendant brings a counterclaim for

defamation, in response to which plaintiff brings a counterclaim under New York's Anti-

Strategic Lawsuits Against Public Participation statute.

This case is before the Court on plaintiff's motion to exclude defendant's expert,

defendant's motion to exclude plaintiff's expert, and plaintiff's motion for summary judgment on

defendant's defamation counterclaim.  Additionally, there is a pending sanctions motion

concerning defendant's alleged violation of the protective order in this case.

## BACKGROUND

Plaintiff and defendant engaged in an "on-again, off-again sexual relationship between

2010 and 2015."  At one point in time, the parties lived together in an apartment in New York

City owned by plaintiff's father.  In late 2011, defendant moved to Los Angeles while plaintiff

remained in New York.  For the next several years, the parties continued to see each other

occasionally.  Plaintiff alleges that defendant sexually assaulted and battered her on multiple

occasions between 2012 and 2015.  Defendant maintains that, although the parties had sex on

these occasions, all of their interactions were consensual.

On the first occasion at issue in this case, plaintiff invited defendant to visit her at Passages, which defendant characterizes as a drug and alcohol rehabilitation facility, and plaintiff refers to as a mental health facility. In her amended complaint, plaintiff states that defendant "forced her to have sexual intercourse with him on a bench along a walkway." Plaintiff stated at her deposition that defendant "stuck his hands down my pants" on a bench, and then the parties went to one of her friend's rooms, which is where defendant forced plaintiff to have sexual intercourse with him. Defendant does not dispute that the parties had sex at Passages, but he maintains that plaintiff initiated the sexual contact and that the entire interaction was consensual.

On another occasion, in January 2014, defendant visited plaintiff at her apartment in Brooklyn. Plaintiff asserts that defendant assaulted and raped her in her apartment, leaving her with two black eyes.

Then, on August 30, 2014, plaintiff alleges that while she was visiting California defendant invited her to his apartment, which was three hours away from where plaintiff was staying. By the time plaintiff was fifteen minutes away from defendant's apartment, the parties had gotten into an argument and defendant told plaintiff not to come over. Nevertheless, plaintiff arrived at defendant's apartment, and when he wouldn't let her in, plaintiff found defendant's back door open and entered his apartment that way. Plaintiff alleges that, at this point, defendant raped her.

The parties agree that plaintiff came to defendant's home the night of August 30, 2014, and that defendant recorded an argument between the parties that night (the "August 30 recording"). According to plaintiff, however, defendant did not record this argument until after defendant raped her. Plaintiff states on the August 30 recording, among other things:

> I have way more power than you do Hector, way more. And if you ever
> [expletive] talk to me that way or threaten me I promise you I will use my power

that I have. . . .  Really?  You [had sex with me] and guess what – and without a condom.  So you know what?  You wanna play that game honey bunch?  I'll say you raped me. . . .  So don't even try.  Way more power than you, way more power.

In another interaction that forms the basis of plaintiff's claims against defendant, plaintiff visited defendant's apartment in March 2015.  A friend of both plaintiff and defendant, William Charles Moore, III, testified at his deposition that right before plaintiff left for her trip to Los Angeles, she confided in Moore that she was planning to get pregnant by defendant during her trip.  Both parties concede that they had sex during plaintiff's trip to Los Angeles, but plaintiff asserts that it was non-consensual.  Plaintiff conceived a child from this interaction, who was born in December 2015.

Defendant asserts that plaintiff did not begin accusing him of rape until after the parties' child was born.  Plaintiff vehemently disputes this characterization, asserting that she told her mother in 2014 that defendant had raped her, and that she told a friend that her pregnancy was the result of rape while she was pregnant.

Between February 24 and June 15, 2023, years after the parties' relationship ended and months after plaintiff had commenced this lawsuit, plaintiff posted four Instagram stories and sent three direct messages via Instagram, one to defendant's employer and two to his friend, all calling defendant a rapist.  These postings are the basis for defendant's counterclaim against plaintiff for defamation.

Defendant's employer, Paul Balthazar Getty, never saw the direct message that plaintiff sent to him on February 24, 2023.  However, Celina Huang, to whom plaintiff sent the other two direct messages (one on May 25, 2023 and one on June 2, 2023), submitted a declaration that she received the direct messages and read them.  Additionally, Moore testified at his deposition that he saw plaintiff post content on Instagram making "accusations" against defendant and Getty and

calling them "monsters."  Moore subsequently submitted a declaration expanding on his deposition testimony, stating that he had read the four Instagram stories at issue in this case, dated March 24, 2023; May 11, 2023; May 14, 2023; and June 15, 2023.  Moore also attached screenshots of the stories to his declaration.

## DISCUSSION

The Court may only consider admissible evidence in evaluating a party's motion for summary judgment.  See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).  "Accordingly, when a party offers expert testimony in support or opposition to summary judgment and a separate motion has been made to preclude such testimony, a court must decide the motion to preclude first, in order to determine whether such testimony may be considered in connection with the summary judgment motion."  Forte v. Liquidnet Holdings, Inc., No. 14-cv-2185, 2015 WL 5820976, at *4 (S.D.N.Y. Sept. 30, 2015), aff'd, 675 F. App'x 21 (2d Cir. 2017) (citing Raskin, 125 F.3d at 66).  I thus turn first to the parties' motions to exclude each other's experts.

## I.    Plaintiff's Motion to Exclude Expert Opinion of Dr. Lenore Walker

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It requires a proponent to establish by a preponderance of the evidence that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In other words, "the Court must determine: (1) whether the witness is a qualified expert; (2) whether the opinion is based on application of reliable data and methodology to the facts of the case; and (3) whether the expert's testimony will assist the trier of fact to understand the evidence or determine an issue of fact."  Boateng v. Bayerische

Motoren Werke Aktiengesellschaft, No. 17-cv-209, 2022 WL 4357555, at *10 (E.D.N.Y. Sept. 20, 2022) (citation omitted).

The Rule 702 standard is not onerous; "exclusion of expert testimony is warranted only when the district court finds serious flaws in reasoning or methodology." Lickteig v. Cerberus Cap. Mgmt., L.P., 589 F. Supp. 3d 302, 330 (S.D.N.Y. 2022) (cleaned up). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 596 (1993).

Rule 702, however, still imposes limits on how shaky an expert's testimony can be. It excludes expert opinions that are "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Restivo v. Hessemann, 846 F.3d 547, 575-76 (2d Cir. 2017).

Defendant retained Dr. Lenore Walker, a licensed psychologist, to conduct a forensic psychological analysis of him "to assess for possible psychological damages resulting from harassment, defamation, and false allegations of domestic violence and rape from his former girlfriend, [plaintiff] Mollie Minskoff." Dr. Walker evaluated defendant and produced a report based on her evaluation. Dr. Walker also produced a forensic psychological report on plaintiff, in rebuttal to plaintiff's own expert Dr. Chita Raghavan's report, "in order to determine if Ms. Minskoff was a battered woman and raped in her relationship with Mr. Mendoza, and if so . . . was [the battered woman syndrome] caused by the relationship with Mr. Mendoza." Finally, six months after expert reports were due, Dr. Walker produced an "addendum" to her forensic psychological report on defendant to assess the impact on defendant of plaintiff's seven Instagram posts calling defendant a rapist.

Plaintiff moves to exclude the first and third of these reports in their entirety, as well as the vast majority of Dr. Walker's rebuttal report evaluating plaintiff.

## A.  Dr. Walker's Initial Forensic Psychological Report on Defendant

Dr. Walker's initial report on defendant purports to provide opinions on the damages defendant experienced from, among other things, plaintiff's alleged defamation.  To support defendant's claim that he is entitled to emotional damages from plaintiff's defamation, such emotional damages must have been caused by the defamatory statements.  See Brancaleone v. Mesagna, 290 A.D.2d 467, 468-69, 736 N.Y.S.2d 685, 687 (2nd Dep't 2002) ("The plaintiff may properly recover for the alleged emotional distress *caused by* the defamatory statements under the cause of action for defamation." (citation omitted) (emphasis added)); see also Manswell v. Heavenly Miracle Acad. Servs., Inc., No. 14-cv-7114, 2017 WL 9487194, at *20 (E.D.N.Y. Aug. 23, 2017), report and recommendation adopted, 2017 WL 4075180 (E.D.N.Y. Sept. 14, 2017) ("[O]n a claim for defamation per se, a plaintiff is entitled to recover for . . . any humiliation or mental suffering *caused by* the defamation" (citation omitted) (emphasis added)).

Dr. Walker does not once mention in her initial report any impact of the allegedly defamatory statements on defendant.  Instead, her report focuses on the emotional and mental damages defendant suffered from his relationship with plaintiff, which predates the allegedly defamatory statements at issue by several years and is not relevant to defendant's defamation counterclaim or any other claim in this case.  Because Dr. Walker does not include any analysis of damages defendant suffered as a result of plaintiff's alleged defamation, or any other opinions relevant to the issues in this case in her initial report, her opinions contained in that report will not be helpful to the trier of fact and are thus excluded.  See Daubert, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."

(quoting 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 702[02], at 702-18 (1988)).

### B.  Dr. Walker's Rebuttal Forensic Psychological Report on Plaintiff

Dr. Walker's rebuttal report evaluating plaintiff is admissible to the extent the opinions contained therein rebut Dr. Raghavan's opinions and are supported by reliable methodology. The parties do not dispute that Dr. Walker may testify about the results of the Detailed Assessment of Posttraumatic Stress she administered to plaintiff, through which Dr. Walker found that plaintiff "meets the criteria for a diagnosis of PTSD."  Nor does plaintiff challenge the reliability or relevance of the results of Dr. Walker's administration of the Danger Assessment or the Adverse Childhood Experiences Assessment to plaintiff.

The Personality Assessment Inventory that Dr. Walker administered to plaintiff is plainly a reliable methodology for an expert to use, especially given that plaintiff's own expert, Dr. Raghavan, also administered a Personality Assessment Inventory to plaintiff.  However, as plaintiff points out, and defendant does not dispute, Dr. Walker's conclusion from the Personality Assessment Inventory that plaintiff engaged in "negative impression management" is not supported by the assessment itself.  Nor does Dr. Walker provide any other support for this conclusion.  Accordingly, this opinion is excluded.  Dr. Walker may otherwise testify about her conclusions from, and the results of, the Personality Assessment Inventory she conducted on plaintiff, as long as her conclusions are supported by the results of that assessment.

Dr. Walker may also testify about the results from the Trauma Symptom Inventory – Second Edition that she administered to plaintiff, an assessment which Dr. Raghavan also performed on plaintiff.  The fact that Dr. Walker included in her report that plaintiff's responses to this assessment were atypical but did not include the same statement about defendant in her report about him, despite the parties receiving the same exact results on this metric, does not

7

render this part of her opinion unreliable. Dr. Walker testified at her deposition that she "could have said the same thing" about atypicality in her report about defendant. There is no discrepancy between Dr. Walker's interpretations of the two assessments, rather the discrepancy is in whether those interpretations made it into her reports. Accordingly, this Court does not find anything inherently unreliable in Dr. Walker's conclusion that plaintiff's responses were atypical. But plaintiff will be allowed to introduce Dr. Walker's failure to identify defendant's responses as atypical to rebut Dr. Walker's opinion that plaintiff's responses were atypical.

Furthermore, Dr. Walker may testify about the results of the Battered Woman Syndrome Questionnaire she administered to plaintiff, including her opinion that plaintiff does not have battered woman syndrome, but Dr. Walker may not testify that plaintiff is not, in fact, a battered woman based on the questionnaire. Dr. Walker testified at her deposition that the Battered Woman Syndrome Questionnaire captures only whether a subject *has* battered woman syndrome, not whether the subject *is* a battered woman, and that not every battered woman develops battered woman syndrome. Thus, Dr. Walker may not offer the conclusion that plaintiff is not a battered woman.

In addition to testimony about the above evaluations, as narrowed by this Court, Dr. Walker may offer testimony about her criticisms of the tests Dr. Raghavan administered to plaintiff.

Dr. Walker is also permitted to provide her opinion that plaintiff has borderline personality disorder. Plaintiff asserts that Dr. Walker's diagnosis rests on "crediting Defendant's version of the facts to assume Ms. Minskoff is lying," but Dr. Walker's report reflects that she reached her diagnosis based on the Personality Assessment Inventory and the Adverse Childhood Experiences Assessment she administered to plaintiff, as well as her clinical interview of

plaintiff. Dr. Walker's diagnosis of plaintiff with borderline personality disorder is relevant to assessing plaintiff's claim, included in her amended complaint, that defendant's actions caused her "serious and severe psychological injuries and emotional distress [and] mental anguish." This diagnosis is a plausible alternative source of such injuries. Because plaintiff has put her psychiatric status at issue in this case, defendant will be permitted to submit evidence, through Dr. Walker, that he was not the cause of plaintiff's psychological injuries and mental anguish. See Jarick v. City of New York, No. 05-cv-7626, 2006 WL 1379585, at *1 (S.D.N.Y. May 18, 2006) ("To the extent that somebody is claiming . . . psychological trauma . . . [that] opens the door to the possibility that the defendant should be allowed to explore . . . alternate causes for such psychological trauma and other mental health damages." (cleaned up)); Stoner v. New York City Ballet Co., No. 99-cv-196, 2002 WL 31875404, at *5 (S.D.N.Y. Dec. 24, 2002) (defendant's expert permitted to conduct psychological examination of plaintiff because plaintiff had "most assuredly put his emotional and psychiatric status into issue by seeking damages for serious emotional distress and proffering [a psychiatrist] as a witness to testify about his alleged psychological problems").

Dr. Walker's diagnosis of plaintiff with borderline personality disorder is not so prejudicial as to merit its exclusion. Because "[p]laintiff has put h[er] mental health at issue by seeking damages for injury to h[er] mental health," "the opinions and testimony of qualified mental health experts are highly probative." Rosario v. City of New York, No. 18-cv-4023, 2021 WL 1930293, at *4 (S.D.N.Y. May 13, 2021). And Dr. Walker's "opinion offers an alternative theory for the cause of [p]laintiff's alleged damages." Id. "In this context, any unfair prejudice from unflattering descriptions of [p]laintiff is outweighed by the jury's need to determine the cause and extent of [her] injury." Id.

Although Dr. Walker will be allowed to testify about her diagnosis of plaintiff with borderline personality disorder and the traits of an individual with borderline personality disorder, Dr. Walker may not testify about plaintiff's credibility or whether plaintiff was sexually assaulted and battered by defendant.  See United States v. Hamlett, No. 19-3069, 2021 WL 5105861, at *1 (2d Cir. Nov. 3, 2021) (summary order) ("expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." (quoting Nimely v. City of New York, 414 F.3d 381, 398 (2d Cir. 2005)); Discepolo v. Gorgone, 399 F. Supp. 2d 123, 130 (D. Conn. 2005) (allowing psychologist to testify "that the plaintiff suffers from PTSD, that sexual abuse can be a stressor sufficiently severe to result in PTSD, and that plaintiff's symptoms and behaviors are consistent with those of people who have suffered childhood sexual abuse," but not to "opine on the credibility of plaintiff or offer any opinion that plaintiff in fact suffered the sexual abuse she claims"); United States v. Funds Held in the Name or For the Ben. of John Hugh Wetterer, 991 F. Supp. 112, 120-21 (E.D.N.Y. 1998) (A psychologist's "testimony on the issues of whether the sexual abuse occurred, and whether [a defendant] was the perpetrator, are unduly prejudicial and will be ignored by the Court." (citations omitted)).

Nor may Dr. Walker testify about the facts contained in the "Brief Relevant History of Ms. Minskoff" section of her report, or any other purely narrative statements, unless Dr. Walker learned of such facts through, and they were relevant to the results of, the psychological evaluations of plaintiff that Dr. Walker conducted.  See In re M/V MSC Flaminia, No. 12-cv-8892, 2017 WL 3208598, at *2 (S.D.N.Y. July 28, 2017) ("[E]xperts are not percipient witnesses to facts, and they cannot offer factual narratives in the form of expert testimony that would

displace the role of the factfinder.  The Court therefore precludes those portions of expert reports that simply present factual narratives about the events at issue in this action.").

### C.  Dr. Walker's "Addendum" to Her Forensic Psychological Report on Defendant

Finally, Dr. Walker may not testify about the opinions expressed in her "addendum" to her initial forensic psychological report on defendant.  This report was disclosed to plaintiff a mere two days before plaintiff's motion to exclude Dr. Walker's testimony was due, and approximately six months after the deadline for the disclosure of expert reports had passed.

Defendant asserts that the addendum report is admissible because it falls under defendant's Rule 26(e) duty to supplement information upon learning that previously disclosed information is incomplete or incorrect.  Defendant asserts that, when Dr. Walker was asked at her deposition whether she had identified in her initial report "specifically which social media postings were the ones that were traumatic for him," she realized that her initial report was, as this Court has also concluded, "materially incomplete," and "[i]t was at this moment that Dr. Walker's duty to supplement her report arose."

This argument completely misconstrues the import of Federal Rule of Civil Procedure 26(e).  "Rule 26(e) is not . . . a vehicle to permit a party to serve a deficient opening report and then remedy the deficiency through the expedient of a 'supplemental' report."  Lidle v. Cirrus Design Corp., No. 08-cv-1253, 2009 WL 4907201, at *5 (S.D.N.Y. Dec. 18, 2009).  "[C]ourts will not admit supplemental expert evidence following the close of discovery when it expounds a wholly new and complex approach designed to fill a significant and logical gap in the first report."  Williams v. E. Meadow Union Free Sch. Dist., No. 21-cv-3310, 2025 WL 218829, at *4 (E.D.N.Y. Jan. 16, 2025) (cleaned up).  "To allow such new evidence to be presented would undermine the purpose of the discovery rules, circumvent the discovery schedule that was ordered by the court, and prejudice a plaintiff."  Id. (citation omitted).  "Indeed, experts are not

free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions." Id. (internal quotation marks and quotation omitted). Yet, these impermissible aims are exactly what defendant submits Dr. Walker's addendum report to achieve: Dr. Walker's initial report failed to connect any of defendant's psychological damage to the allegedly defamatory statements, so she wrote the addendum report to address this failure, introducing brand new, previously undisclosed opinions.

The actual duty to supplement imposed by Rule 26 "arises when the expert subsequently learns of information that was previously *unknown or unavailable*, and the new information renders the earlier report incomplete or inaccurate." Butler v. Suffolk Cnty., No. 11-cv-2602, 2025 WL 416854, at *8 (E.D.N.Y. Feb. 5, 2025) (quotation omitted) (emphasis added). Surely, information on the impact of plaintiff's allegedly defamatory statements on defendant, all of which were published in 2023, was not "unknown" to defendant or "unavailable" to Dr. Walker before Dr. Walker's June 2024 deposition. It is inconceivable that Dr. Walker, let alone defendant, learned for the first time at Dr. Walker's deposition in June 2024 that defendant's only claim in this case is for defamation, when defendant asserted this counterclaim more than a year prior.

The Court thus rejects defendant's characterization of the addendum report as a supplemental report under Rule 26, and turns to consider whether the untimely report should be excluded. "Where a party has failed to comply with a court-imposed deadline for expert disclosures and then seeks to avoid preclusion, courts consider (1) the reason for the non-compliance, (2) the importance of the witness to be precluded, (3) prejudice to the opposing party, and (4) any potential for continuance." Id. (cleaned up). The party seeking to admit an

untimely expert report "bears the burden of establishing that noncompliance was either 'substantially justified or harmless.'" Id. (quotation omitted).

Defendant's only proffered reason for non-compliance is that "Plaintiff's counsel did not indicate that they would move to preclude Dr. Walker's testimony" for failing to address the connection between defendant's damages and the allegedly defamatory statements "until July 2024." The Court does not accept defendant's placement of blame on plaintiff's counsel. It is defense counsel's failure to realize that defendant's expert would need to connect her analysis of the damages defendant suffered to the harm that defendant himself claims caused such damages in his counterclaim that led to the deficiency in the report. In other words, there is nothing except oversight by the defense, whether that be by defense counsel or by Dr. Walker, that prevented Dr. Walker from making the conclusions presented in her addendum report in her initial report. And defendant provides no explanation or justification for this oversight.

The importance of the testimony to be excluded "cuts in favor of [defendant], but only slightly." Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc., 118 F.3d 955, 962 (2d Cir. 1997). Although Dr. Walker's testimony about defendant's psychological damages from plaintiff's allegedly defamatory statements would of course be relevant to the amount of damages defendant could recover, defendant has other, albeit potentially less powerful, ways to introduce evidence of his damages. For example, defendant may testify as a fact witness about the damages he suffered from plaintiff's statements. Although there will likely be some prejudice to defendant from the preclusion of expert testimony about his psychological damages, it is "hardly tantamount to a dismissal." Id. (internal quotation marks omitted).

On the other hand, the prejudice to plaintiff of admitting Dr. Walker's addendum report cuts in favor of excluding the report. Plaintiff was never able to depose Dr. Walker on her

13

opinions of the impact of the allegedly defamatory statements on defendant, or to submit a rebuttal expert report challenging these opinions. Thus, either expert discovery would have to be reopened at this late stage in the case, or at trial plaintiff would not be able to offer expert testimony to rebut Dr. Walker's opinions in the addendum report, letting them stand uncontested other than through cross examination of Dr. Walker herself. See Williams, 2025 WL 218829, at *7 (finding that prejudice to the party opposing an untimely expert report "heavily favors preclusion" because "[a]llowing these supplemental reports would inevitably necessitate reopening expert discovery on damages and a new medical diagnoses, potentially leading to further depositions, reports, and motion practice, thereby resulting in increased time and resources to an already lengthy litigation that is nearing an end" (citations omitted)); Lidle, 2009 WL 4907201, at *7 (same).

Finally, considering the availability of a continuance, it is true that no trial date has been set. But this case has been pending since January 2023, and a prompt trial date is going to be set upon issuance of this decision. The Court previously granted defendant's request for an extension of the deadline to submit expert reports, and was even lenient when defendant then missed the deadline he requested with the submission of Dr. Walker's initial report several days late. As mentioned above, the addendum report comes six months after the Court's already extended deadline for expert reports. "[A]llowing deadlines to continue to slip results in the backup of other cases and eventual scheduling chaos as a series of bottlenecks builds." Grabin v. Marymount Manhattan Coll., 659 F. App'x 7, 11 (2d Cir. 2016) (cleaned up). Moreover, "a continuance would not be appropriate in the absence of any valid explanation for [defendant's] delays." Canales v. United States, No. 19-cv-834, 2021 WL 1588809, at *6 (E.D.N.Y. April 22, 2021), aff'd, 2021 WL 5830765 (E.D.N.Y. Dec. 8, 2021). "[T]o hold otherwise would be

tantamount to rewarding [defendant] for having 'sandbagged' [plaintiff] with [his] extraordinary late expert disclosure." Butler, 2025 WL 416854, at *8 (internal quotation marks and quotation omitted).

Weighing the above factors, the Court concludes that defendant is not entitled to introduce Dr. Walker's addendum report, and her opinions contained therein are excluded.

## II. Defendant's Motion to Exclude Expert Opinion of Nick Barreiro

Defendant moves to exclude the opinion of Nick Barreiro, a certified audio video forensic analyst, and one of plaintiff's experts, concerning the August 30 recording. Barreiro used critical listening to analyze the August 30 recording. In doing so, he identified rustling sounds that are referred to as a "pocket rustle," leading Barreiro to conclude that the phone used to record the August 30 recording did not "remain[ ] out in the open for the duration of the recording," and that "[t]he rustling sounds it contains are consistent with a recording device that was inside a pocket, or otherwise concealed in fabric, for a significant portion of the recording."

According to the parties, because the conversation occurred in California, if defendant recorded the conversation without plaintiff's consent, and the conversation is deemed a "confidential communication," the August 30 recording will not be admissible for consideration on summary judgment or at trial. Cal. Penal Code § 632(a), (d). Both parties fail to recognize that federal law, not California state law, governs the admissibility of the August 30 recording. "Thus, that the instant recording may well [be] excludable under California law is entirely irrelevant to its admissibility in this case." Hernandez v. Money Source Inc., No. 17-cv-6919, 2022 WL 2702894, at *5 (E.D.N.Y. July 12, 2022) (citation omitted). "Under federal law . . . a telephone conversation may be taped as long as one party to the conversation consents to the taping." Id. (cleaned up). No one disputes that defendant consented to the August 30 recording,

as the individual who created the recording.  The August 30 recording is therefore admissible, and Barreiro's testimony is not relevant to the determination of this issue.

Plaintiff offers one more topic on which she asserts Barreiro's testimony will be relevant: which party's version of events is more believable.  If plaintiff states at trial that the phone was concealed for the August 30 recording, and defendant states it was not, Barreiro's testimony could provide an objective metric that would aid the jury in determining that defendant's version of events is improbable.  See U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cnty., N.Y., No. 06-cv-2860, 2009 WL 1110577, at *1 (S.D.N.Y. April 22, 2009) (expert testimony is admissible "to discredit an opponent's version of events as improbable." (citing United States v. Cruz, 981 F.2d 659, 664 (2d Cir. 1992)).

In determining the relevance of expert testimony, the Court must determine "whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (cleaned up).  Certainly, Barreiro's testimony would make the concealment of the phone more probable.  This Court has some doubt as to whether the concealment (or not) of the phone "is of consequence to the determination of the action."  Id.  However, because this case depends so much on the credibility of the parties, if at trial the parties dispute the concealment of the phone, Barreiro's testimony will be relevant to the jury's determination of the probability of this fact.

The Court finds Barreiro's opinion sufficiently reliable for admission.  Critical listening, the method through which Barreiro formed his opinion that defendant's phone "was inside a pocket, or otherwise concealed in fabric, for a significant portion of the recording," has been recognized by the FBI "as an essential component of forensic audio analysis," and has been

16

accepted by federal courts as a reliable method for conducting forensic audio analysis. ABS Ent., Inc. v. CBS Corp., 908 F.3d 405, 421 (9th Cir. 2018); see also Jung v. Neschis, No. 01-cv-6993, 2009 WL 762835, at *10 (S.D.N.Y. March 23, 2009); United States v. Naegele, 471 F. Supp. 2d 152, 158-59 (D.D.C. 2007); United States v. Gerena, 695 F. Supp. 649, 669 (D. Conn. 1988), vacated on other grounds sub nom. United States v. Ojeda Rios, 495 U.S. 257 (1990). Defendant does not offer any suggestion that Barreiro's application of this reliable methodology to the facts of this case render his opinion unreliable.

Barreiro is qualified to provide this opinion. He is a certified audio video forensic analyst who has received training in audio forensics from the FBI and the California Department of Justice, among other institutions. In addition to this training, Barreiro has more than sufficient experience: he spent fifteen years as a law enforcement officer in California, during which time he "handled all media forensics including collecting, enhancing, and analyzing video footage from surveillance cameras, cell phones, traffic cameras, body-worn cameras, and dash cameras." Furthermore, he has "conducted hundreds of forensic audio, video, and image investigations" and has "analyzed thousands of digital files."

Defendant's contention that "Barreiro's experience and training is too general" and does not extend to "analyzing audio to determine the nature of pocket rustle, whether an audio device is concealed, or what it is concealed by" is belied by Barreiro's deposition testimony. Barreiro testified that he has determined "many times" whether an audio recording was made on a device that was concealed, that "[t]he identification of pocket rustle is a large part of [his] job in dealing with audio recordings," and that in the many cases Barreiro worked on involving "a known concealed device, that audio that [he] hear[ed] in those cases match with this case." This experience evinces a sufficient familiarity with, and expertise on, using pocket rustle to

determine whether an audio device is concealed during a recording.  If defendant still has concerns about Barreiro's qualification to offer his opinion, he may of course ask Barreiro questions about his qualifications on cross-examination.

Defendant's Rule 403 concerns are also unfounded.  There will be no "unfair prejudice" based on Barreiro's background in law enforcement, which allegedly "improperly influenced his opinion that any type of 'pocket rustle' in an audio must be a surreptitious reco[r]ding." Accepting this line of reasoning, any law enforcement officer's testimony would be unfairly prejudicial.  Barreiro's report and deposition testimony provide no indication that his opinion was improperly influenced by his background.  As this concern relates to the weight the jury should give to Barreiro's testimony, defendant may ask Barreiro, on cross examination, whether most of his experience has been "with audio recordings in which concealment of the device was not disputed."  Nor will there be any confusion of the issues in determining whether the August 30 recording is admissible, as this issue has been resolved.

For the foregoing reasons, defendant's motion to exclude Barreiro's testimony is denied.

## III.    Plaintiff's Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must view all facts in the light most favorable to the nonmoving party, in this case, defendant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  There is no genuine issue of material fact "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (cleaned up)).

18

Neither party disputes that New York law governs defendant's defamation counterclaim. "[A] defamation [claimant] must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." Palin v. New York Times Co., 940 F.3d 804, 809 (2d Cir. 2019) (citing Celle v. Filipino Reporter Enterps. Inc., 209 F.3d 163, 176 (2d Cir. 2000)).

Plaintiff asserts that she is entitled to summary judgment because defendant cannot show that the defamatory statements were published to third parties and because it is beyond dispute that plaintiff lacked the requisite malice necessary for liability. Plaintiff also argues that, if defendant's defamation claim does survive summary judgment, he is only entitled to garden variety emotional distress damages.

## A. Publication

"[P]ublication to a third party is the cornerstone of defamation." McCollum v. Baldwin, 688 F. Supp. 3d 117, 128 (S.D.N.Y. 2023) (citations omitted). "Publication occurs when the [defamatory] words are read 'by someone other than the person libeled and the person making the charges.'" Van-Go Transp. Co. v. New York City Bd. of Educ., 971 F. Supp. 90, 102 (E.D.N.Y. 1997). "To be liable for defamation, the [defamer] must induce or cause publication in some fashion." Id.

Here, defendant does not present any evidence that anyone read the direct message plaintiff sent to Getty on February 24, 2023. Getty himself denies ever having read it. Accordingly, this statement cannot form the basis of defendant's defamation counterclaim.

For the other two direct messages, defendant points to Huang's declaration as proof of publication. Based on defendant's attachment of the two direct messages to his amended answer and counterclaim, defendant was aware that Huang had received these direct messages by, at the

19

latest, September 28, 2023.  Despite this knowledge, defendant did not disclose to plaintiff Huang's identity until January 19, 2024.  Then, when plaintiff asked defendant to provide discovery concerning Huang, defendant refused.  Seven months later, to support defendant's opposition to plaintiff's letter motion for a premotion conference to file a motion for summary judgment, defendant submitted a declaration from Huang showing publication of the direct messages that plaintiff sent her.  And still, despite plaintiff's continued requests, defendant refused to provide plaintiff with any discovery as to Huang.  Defendant did not update his initial disclosures to include Huang until August 12, 2024, four days before plaintiff's summary judgment motion was due (although she later received a two week extension).  In sum, defendant did not disclose Huang as a witness until almost a year after he knew of her relevance to the case, did not provide plaintiff with the evidence he wished to introduce through Huang until he opposed plaintiff's proposed motion for summary judgment, and refused to provide plaintiff with any discovery that could mitigate the prejudice from this late disclosure.

"It is well settled in this Circuit that a party may not raise a factual allegation for the first time on summary judgment."  Brtalik v. S. Huntington Union Free Sch. Dist., No. 10-cv-10, 2012 WL 748748, at *5 (E.D.N.Y. March 8, 2012) (citation omitted).  Especially given the numerous chances defendant had to provide plaintiff with the requested information about Huang, his complete refusal to do so, and defendant's failure to provide any excuse for the untimeliness of Huang's disclosure, I will not consider Huang's declaration in ruling on plaintiff's motion for summary judgment.  Because defendant provides no other support for the publication of the May 25, 2023 and June 2, 2023 direct messages, those messages may not form the basis of defendant's defamation counterclaim.

As to the four Instagram stories at issue in this case, defendant offers as proof of publication Moore's deposition testimony and declaration.  Moore's statement at his deposition that he saw plaintiff's accusations against defendant on Instagram, including that plaintiff called defendant a monster, and Moore's declaration that he read the four Instagram stories at issue in this case, provide sufficient support for publication to survive a motion for summary judgment.  Although Moore expanded on his deposition testimony in his declaration, this is not a situation in which defendant is trying to create a triable issue by submitting an affidavit contradicting previous testimony.  Cf. Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 43 (2d Cir. 2000) ("[A] party who has testified to a given fact in his deposition cannot create a triable issue merely by submitting his affidavit denying the fact." (citation omitted)).  Rather, Moore's "later sworn assertion addresses an issue that was not, or not thoroughly or clearly, explored in the deposition."  Id. (citation omitted).  "An issue of fact . . .  may be revealed by a [witness's] subsequent testimony that amplifies or explains, but does not merely contradict, his prior testimony."  Id. (cleaned up).

Where, as here, a subsequent declaration amplifies or explains a witness's previous deposition testimony but does not contradict it, a "district court should not disregard the post-deposition testimony because of an earlier account that was . . . simply incomplete."  Id. (cleaned up).  Because Moore testified at his deposition that he saw plaintiff make accusations against defendant on Instagram, and expanded on this testimony in his declaration to identify the four Instagram stories at issue in this case, defendant has created (at least) a genuine dispute as to whether these four Instagram stories were published.  These stories may thus form the basis of defendant's defamation counterclaim.

**B. Actual Malice**

The level of fault required to prevail on a defamation claim depends on where the allegedly defamatory statement was made and whether it was made "in connection with an issue of public interest." Fradkoff v. Winston, No. 24-cv-1830, 2025 WL 1735476, at *7 (S.D.N.Y. June 23, 2025). When an allegedly defamatory statement is made "in a place open to the public or a public forum," and "is in connection with an issue of public interest," the fault element required to prevail on a defamation claim is "actual malice." Id.

Here, the actual malice standard applies because plaintiff made the statements at issue in a public place in connection with an issue of public interest. "[C]ourts have found [social media] posts accusing an individual of sexual assault to be communications concerning an issue of public interest." Watson v. NY Doe 1, No. 19-cv-533, 2023 WL 6540662, at *5 (S.D.N.Y. Oct. 6, 2023) (cleaned up) (quoting Goldman v. Reddington, No. 18-cv-3662, 2021 WL 4099462, at *4 (E.D.N.Y. Sept. 9, 2021)). Moreover, social media sites, including Instagram, are considered public fora. See id. at *4.

A party acts with actual malice when she makes a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." Palin, 940 F.3d at 816 (quotation omitted). Actual malice "may be proved inferentially because it is a matter of the [defamer's] subjective mental state, revolves around facts usually within the [defamer's] knowledge and control, and is rarely admitted." Celle, 209 F.3d at 183 (quoting Dalbec v. Gentleman's Companion, Inc., 828 F.2d 921, 927 (2d Cir. 1987)). Courts will infer actual malice when there is evidence of "negligence, motive and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice." Id. (quotation and citation omitted). "Actual malice can be established through the [defamer's] own actions or statements, the dubious nature of [her] sources, and the inherent improbability of the story

22

among other circumstantial evidence." <u>Id.</u> (cleaned up).  Although "standing alone, . . . evidence of ill will is not sufficient to establish actual malice," "[e]vidence of ill will combined with other circumstantial evidence indicating that the [defamer] acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice." <u>Id.</u> (citations omitted).  To prevail on summary judgment, plaintiff must show that "no reasonable factfinder could find, by clear and convincing evidence, that [she] acted with actual malice." <u>Coleman v. Grand</u>, 523 F. Supp. 3d 244, 260 (E.D.N.Y. 2021) (citations omitted).

Here, a reasonable factfinder could find, by clear and convincing evidence, that plaintiff called defendant a rapist in the statements at issue knowing that defendant did not sexually assault her.  First, defendant cites and provides evidence of a powerful motive to lie: keeping defendant from seeing the child he shares with plaintiff.  Defendant asserts that plaintiff did not start accusing defendant of rape until after the parties' child was born, an assertion that is supported by the deposition testimony of Oscar Armando Toro ("Q. Did she ever mention to you or tell you that she was raped by Mr. Mendoza?  A. Not until – not until years later. . . .  I'm going to say probably around the time her daughter was born.  After that, she started going on her whole campaign of Hector raped me.") and Moore ("Q. And when did you first become aware of her accusations that Hector had raped her?  A. Maybe, I believe, [the parties' child] was probably about two years old when – when everything surfaced.").  To that end, plaintiff admitted at her deposition to leaving defendant off of their child's birth certificate "[b]ecause [she] didn't want him having any rights to her or to be involved in her life," telling defendant that he was not the father even though she knew he was, telling other people that he was not the father of their child, and refusing defendant's request to take a paternity test.

Second, the ill will between the parties is palpable.  Plaintiff explicitly told defendant on the August 30 recording that she had more power than he did and that she would use it against him, stating "you know what?  You wanna play that game honey bunch?  I'll say you raped me. . . .  So don't even try.  Way more power than you, way more power."

Third, there is sufficient circumstantial evidence, when considered in conjunction with the evidence of motive and ill will, that a reasonable factfinder could find that plaintiff knew or recklessly disregarded the fact that that defendant did not sexually assault her.  Considering the differences between plaintiff and defendant's versions of events, and differences in plaintiff's own recollection over time, the jury could certainly conclude that plaintiff was making up her accusations against defendant, and knew of the falsity of her statements when she posted the four Instagram stories at issue in this case.

For example, while plaintiff was at Passages, she disclosed to a treatment provider that she had been molested by her landlord and raped by boyfriends when she was eighteen to nineteen years old.  But she did not tell anyone at Passages (or otherwise) that defendant raped her while she was at Passages.  Moreover, there are inconsistencies in her story: in her amended complaint, plaintiff alleges that defendant had sexual intercourse with her on a bench; in her deposition, she testified that the assault began on a bench, but that the parties did not have sexual intercourse until they were in one of her friend's bedrooms.

Regarding the alleged January 2014 sexual assault, plaintiff testified before a grand jury that defendant punched her and threw her on the couch face-up before raping her.  At her deposition for this case, plaintiff testified that defendant did "not punch[ ] me in the face," but rather "slammed my head into the wall."  Moreover, the rape was face down on the bed in this telling.  Plaintiff further testified that the January 2014 incident was the only time she got black

eyes from defendant, and that any photographs of her with black eyes would have been taken in January 2014.  However, the parties do not dispute that metadata from at least one of the photographs of plaintiff with black eyes shows that it was taken on April 13, 2024, more than three months after the alleged assault.

As for the alleged March 2015 assault, Moore testified that plaintiff told him that she intended to have sex with, and become pregnant by, defendant while she was in Los Angeles. Plaintiff asserts that this is a lie.

The Court does not point to this testimony to suggest that an individual cannot be sexually assaulted if she enters an interaction intending to have sex, or to the above discrepancies as definitive proof that plaintiff is lying.  However, these discrepancies, and other he-said-she-said issues that pervade the other alleged sexual assaults at issue in this case, could lead a reasonable factfinder to credit defendant's version over plaintiff's, and to determine by clear and convincing evidence that plaintiff knowingly lied or acted with reckless disregard for the truth when she stated that defendant was a rapist on her Instagram story.

Plaintiff's motion for summary judgment on defendant's counterclaim is therefore denied.  However, defendant's counterclaim may only be based on the four Instagram stories defendant has identified; the three direct messages will not be considered.

### C. Damages

The parties do not dispute that, assuming the above elements of a defamation claim are satisfied, defendant will have made out a case of defamation per se.  This means that defendant's counterclaim is "actionable without pleading and proof of special damages."  Celle, 209 F.3d at 179 (internal quotation marks and quotation omitted).  Accordingly, even if defendant "can show no actual damages at all," as long as he "has otherwise shown defamation," he "may recover at least nominal damages."  Id. (quotation and citations omitted).

25

Although plaintiff acknowledges that defendant will be entitled to some damages if he prevails on the other elements of his defamation counterclaim, plaintiff argues that defendant should be limited to recovering "garden variety" emotional distress damages because the only admissible evidence of his emotional distress is his own testimony. Plaintiff is correct that, to recover garden variety emotional distress damages, "the evidence of mental suffering is generally limited to the testimony of the [party], who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." Olsen v. Cnty. of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (internal quotation marks and quotation omitted). In contrast, significant emotional distress damages "are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." Id. at 46-47 (quotation omitted). And egregious emotional distress damages are awarded when there is "either outrageous or shocking . . . conduct or a significant impact on the physical health of the plaintiff," typically evidenced by "debilitating and permanent alterations in lifestyle." Id. at 47 (internal quotation marks and quotation omitted).

Usually, then, to be entitled to significant or egregious emotional distress damages, a party must present medical testimony or evidence about the effect of the emotional damages. But the caselaw specifies that such corroboration is not always necessary, and that outrageous or shocking conduct may also entitle a party to more damages than just those for garden variety emotional distress. See, e.g., Doe v. Long Island Motors, Inc., No. 21-cv-1232, 2022 WL 21781446, at *5 (E.D.N.Y. June 8, 2022) (finding egregious emotional distress damages appropriate based on plaintiff's and her mother's testimony, without any "medical testimony or documentation to support her claims"); Sylvester v. City of New York, 385 F. Supp. 2d 431, 444

(S.D.N.Y. 2005) ("In some cases, the allegations are such that severe emotional distress requires no medical evidence." (citation omitted)).

The exclusion of Dr. Walker's testimony thus does not automatically foreclose the possibility that defendant may be able to prove at trial serious or egregious emotional distress damages. Although defendant might only be able to prove garden variety emotional distress damages at trial, "that is an issue to resolve at trial." Sanders v. City of New York, No. 16-cv-6526, 2020 WL 6551267, at *2 n.2 (E.D.N.Y. Oct. 30, 2020); see also Castro v. Green Tree Servicing LLC, 959 F. Supp. 2d 698, 722 (S.D.N.Y. 2013) (declining to limit damages available to plaintiffs at summary judgment stage just because they did not submit medical proof of their emotional distress). "At this point, it is premature to determine what the evidence will reveal about [the defamed party's] emotional distress damages." Colon v. City of New York, No. 16-cv-4540, 2023 WL 6497650, at *6 (S.D.N.Y. Oct. 5, 2023), reconsideration denied sub nom. Colon v. New York City Hous. Auth., 2024 WL 714681 (S.D.N.Y. Feb. 21, 2024). Plaintiff's motion to limit defendant's possible damages recovery to garden variety emotional distress damages is denied.

**IV.    Sanctions**

Finally, the Court turns to plaintiff's motion for sanctions based on defendant's disclosure of information in a separate proceeding that plaintiff asserts is subject to a protective order in this case. As part of this case, defendant requested, and the Court granted, that the parties' child undergo a paternity test. It was a hotly contested request, and the Court authorized it under the direct proviso that the results of the test would not leave this action.

The test confirmed that defendant is the father of the parties' child. About a year later, defendant requested that the Court allow him to use the results of the paternity test, confirming that he is the father of the parties' child, to file for guardianship and custody of the parties' child.

As defendant acknowledged, the paternity test is subject to a protective order in this case. This request was allegedly prompted by defendant's learning that plaintiff had been admitted to an in-patient alcohol treatment program, and so was unable to care for the parties' child.

This Court denied defendant's request twice without prejudice, finding that defendant had failed to show that the child's paternity had been brought into question in a separate proceeding. Plaintiff subsequently moved for sanctions, asserting that defendant disclosed the results of the paternity test anyway, as well as the contents of a recorded therapy session and plaintiff's deposition testimony, both of which are also subject to this Court's protective order, in a filing in Washington State Superior Court in a proceeding concerning the guardianship of the parties' child.

Defendant asserts that all of the disclosures at issue "were made based on [defendant's] personal knowledge and/or do not constitute confidential information as contemplated by the protective order."

The protective order entered in this case provides that "Discovery Material designated as 'CONFIDENTIAL,'" as the paternity test was designated, "shall be held in confidence by each Qualified Recipient to whom it is disclosed, shall be used only for purposes of this action, and shall not be disclosed to any person who is not a Qualified Recipient." Qualified recipients are defined as the parties, their agents or employees assisting them in this action, counsel, expert witnesses, this Court and court personnel, staff involved in depositions (stenographers, etc.), trial and deposition witnesses, and "any other person agreed to by the Producing Party."

The first disclosure at issue is defendant's statement in his affidavit in the Washington State guardianship proceeding that: "As part of 2022-2023 defamation suit proceedings in New York, it was established by DNA test that I am [the child's] biological father." Defendant asserts

28

that this statement was not a violation of the protective order in this case because a protective order cannot restrict the dissemination of information obtained independently from the discovery process, and the fact that defendant is the parties' child's biological father is not subject to the protective order and is a fact wholly within defendant's personal knowledge. Moreover, defendant argues, the existence of the paternity test is not subject to the protective order because this Court ordered a buccal swab parental test publicly on the docket.

Defendant is correct that the protective order in this case does not prevent him from stating that, based on his knowledge, he is the child's biological father, and that the Court ordered a paternity test in this case. But defendant's statement goes further than that. He explicitly states the results of the paternity test, which defendant cannot contend were obtained independently from the discovery process or were wholly within his personal knowledge. In fact, his lack of personal knowledge is the very reason why he asked this Court to order the paternity test. He had no certainty with whom else plaintiff might have had relations. It was one thing for him to say to another court, "I believe with great confidence that I am the father." It is another thing entirely to say "a paternity test authorized by judicial order has proven it." Accordingly, this statement was made in violation of the Court's protective order.

The second statement at issue is defendant's assertion that the parties "attended therapy sessions together in California to save our relationship. During one of these sessions, which was recorded, [plaintiff] admitted to becoming violent and hitting me during a vacation we took to Jamaica." On this statement, the Court agrees with defendant that "[t]he recording itself is protected under the Protective Order, but the fact that Plaintiff admitted to becoming violent is not – [defendant] attended this joint session and, therefore, has personal knowledge of the

29

discussions during that session." Accordingly, the Court will not consider this disclosure as a violation of the protective order.

The last contested disclosure is defendant's statement in his affidavit that "[d]espite what was made to seem like an unexpected pregnancy, I would later learn during depositions in the civil proceedings that [plaintiff] confided in a mutual friend that she went to LA with the intent and purpose of getting pregnant." This, of course, refers to Moore's deposition testimony, not plaintiff's. It is not at all clear whether the parties intended this deposition to be confidential, such that it would be governed by the protective order in this case. The deposition is marked as "HIGHLY CONFIDENTIAL" on the first page, but that does not comply with the protective order's instructions for designating discovery material as confidential. The protective order provides that the producing party "shall affix, either by notation on each page of the document so designated, statement on the record of a deposition, or written advice to the respective undersigned counsel for the Parties hereto, a 'CONFIDENTIAL' designation to any confidential Discovery Material produced in this Action." And, specifically for depositions, "All depositions shall presumptively be treated as Confidential Information and subject to this Protective Order during the deposition and for a period of fifteen (15) days after a transcript of said deposition is received by counsel for each of the Parties. At or before the end of such fifteen (15) day period, the deposition shall be classified appropriately."

Because plaintiff is the party seeking sanctions, she has "the initial burden of demonstrating [defendant's] noncompliance" with the protective order. Jay v. Spectrum Brands Holdings, Inc., No. 13-cv-8137, 2015 WL 6437581, at *6 (S.D.N.Y. Oct. 20, 2015). But Moore's deposition was not affixed with a confidential notation on any of the pages defendant referenced in his affidavit, nor does plaintiff provide the Court with any indication that the

parties stated on the record of Moore's deposition that the deposition would be treated as confidential, that counsel exchanged written advice that the deposition would be confidential, or that the parties classified the deposition transcript in anyway within fifteen days of counsel receiving a transcript of the deposition.

Furthermore, by the terms of the protective order itself, the information defendant included in his affidavit from Moore's deposition is not confidential.  It does not involve commercial business information, employment or education information, information about the parties' "intimate relationship and sexual history" (at least not with the specificity or explicitness that would require confidentiality), information concerning settlement discussions, medical or mental health information, or records prohibited from disclosure by statute.

Moreover, defendant filed publicly on the docket an excerpt of Moore's deposition containing the information at issue on October 15, 2024.  Plaintiff never took issue with this filing.  Although the protective order specifies that "[t]he production or disclosure of Confidential Information shall in no way constitute a waiver of each Producing Party's right to object to the production or disclosure of other information in this action or in any other action," plaintiff's failure to take any issue with the previous filing of Moore's deposition transcript weighs in favor of this Court finding that the transcript was never confidential to begin with. The Court thus finds that defendant's reference to information from Moore's deposition transcript in his Washington State guardianship proceeding affidavit did not violate this Court's protective order.

Based on the above analysis, the only disclosure for which the Court will consider imposing sanctions is defendant's statement that "As part of 2022-2023 defamation suit proceedings in New York, it was established by DNA test that I am [the child's] biological

father." Courts in this Circuit have "consistently held that a protective order issued under Rule 26(c) can be enforced through Rule 37(b)." Jay, 2015 WL 6437581, at *5 (citations omitted). In determining what sanctions are "just" and "commensurate with the non-compliance," courts are "guided by a number of factors, including: (1) the willfulness of the noncompliant party or the reasons for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the noncompliant party had been warned of the consequences of his noncompliance." Id. at *5-6 (cleaned up).

 Turning first to defendant's willfulness and reasons for noncompliance, the violation is egregious. This Court had twice considered defendant's motion to use this information, and twice denied it because defendant failed to show that his paternity had been brought into question in the Washington State guardianship proceeding. Defendant is not correct, as a matter of law, when he states that "he need[ed] to show he is [the child's] biological father to have standing to claim guardianship over her." Although a parent is entitled to notice of guardianship proceedings, Wash. Rev. Code Ann. § 11.130.195, any "person interested in the welfare of a minor, including the minor, may petition for appointment of a guardian for the minor." Wash. Rev. Code Ann. § 11.130.190. And regardless of what he thought his "needs" were, that didn't relieve him from his obligations to this Court. Accordingly, the Court finds that defendant's violation of the protective order was a willful, direct violation of this Court's orders.

 In addition to the fact that defendant's request to use the confidential information in the Washington State guardianship proceeding had been denied twice in this case, defendant was also previously warned of the consequences of violating the protective order. In filing his opposition to plaintiff's motion for summary judgment, defendant did not file under seal multiple pieces of confidential discovery: excerpts of plaintiff's deposition testimony, even though

plaintiff's counsel had provided confidentiality designations to defendant's counsel; a link to a graphic video of plaintiff; and quotes from plaintiff's deposition testimony in his Rule 56.1 statement. The Court declined to grant plaintiff's motion for sanctions, finding that defendant's noncompliance with the protective order was inadvertent and that the period of noncompliance was brief, but the Court still "warned [defendant] that further noncompliance will likely result in sanctions." Not only did defendant engage in further noncompliance by disclosing the results of the paternity test, he did so blatantly, violating two orders denying the use of the paternity test in the Washington State guardianship proceeding in addition to the protective order.

Considering the duration of the period of noncompliance, defendant has not provided the Court with any indication that he has made any attempt to retract or otherwise keep confidential the results of the paternity test. In fact, defendant stands by his use of the confidential information, stating that "[h]e did what he thought was appropriate under the circumstances, which was notify the King County Superior Court that there exists objective evidence confirming that . . . he is [the] biological father" of the parties' child. That he did not come to this Court first and preview what he was going to do in Washington so that this Court could grant or withhold permission is another indication of how brazen his violation was.

In addition, "duration" is less important here where the harm has irretrievably occurred. The information cannot be taken back. The very thing that this Court sought to avoid happening has happened.

Based on the above factors, the Court determines that sanctions are appropriate and will serve the purposes of Rule 37, which are: "(1) to ensure that a party will not benefit from its failure to comply with a court order, (2) to obtain the party's compliance, and (3) to serve as a deterrent." Jay, 2015 WL 6437581, at *5 (citation omitted).

Considering what sanctions to impose in light of these purposes, the Court considers "the efficacy of lesser sanctions." Id. at *6 (quotation omitted). "The 'mildest' sanction specifically enumerated under Rule 37(b) is an order that the party who violated the discovery order at issue, or the attorney advising that party, be required to reimburse the opposing party for expenses caused by the violation." Id. at *12 (citation omitted). "Rule 37(b) generally requires that this sanction be imposed on a party who fails to comply, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Id. (internal quotation marks, quotation, and citation omitted).

As discussed above, there is no way that defendant's violation of the protective order (and two of the Court's subsequent orders) was substantially justified. It still does not appear that it was reasonable or necessary to disclose the results of the paternity test in the Washington State guardianship proceeding. Nor does defendant point to, or the Court find, other circumstances that would make an award of expenses unjust. As a starting point, the Court orders defendant to pay plaintiff the reasonable expenses, including attorneys' fees, caused by his violation. In addition to paying plaintiff the fees and costs associated with the instant motion for sanctions, this will also include the fees and costs incurred in opposing both of defendant's motions to use the results of the paternity test in the Washington State guardianship proceeding, because the Court denied both of these motions, but defendant disclosed the results anyway.

But that is not nearly sufficient. Rarely has this Court had a litigant thumb his nose at a clearly stated court order on a crucial point in an emotionally charged litigation, and, just as bad, try to defend his contemptuous conduct through flimsy excuses. The Court's purpose in allowing the paternity test in the first place was simply to create the possibility of settlement

34

discussions.  Instead, defendant has used it to gain additional emotional leverage over plaintiff in a proceeding that is collateral to this one.

Under these appalling circumstances, both general and specific deterrence loom large. The Court must insure that defendant adheres to its rulings in this case, and the Court also must signal the public as well that insubstantial attempts to circumvent Court authority will not be tolerated.  The Court therefore imposes sanctions on defendant in the amount of $50,000.  The parties are directed to confer and agree on a charity focused on disadvantaged children affiliated with neither of them nor their lawyers to which the sanction shall be paid, failing which they shall make their recommendations and the Court will choose.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to exclude Dr. Walker's expert testimony is granted in part and denied in part, defendant's motion to exclude Barreiro's expert testimony is denied, plaintiff's motion for summary judgment is denied, and plaintiff's motion for sanctions is granted.  By separate order, the Court will set this matter down for trial.

**SO ORDERED.**

_Brian M. Cogan_
_____
U.S.D.J.

Dated: Brooklyn, New York
       September 1, 2025